UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILFORD ARMSTEAD,

          Petitioner,

      v.

DONALD HOLBROOK,

          Respondent.

Case No. C11-563-RSM-JPD

REPORT AND RECOMMENDATION

## I.    INTRODUCTION AND SUMMARY CONCLUSION

Petitioner Wilford Armstead, an inmate proceeding *pro se* and *in forma pauperis* who is currently incarcerated at the Washington State Penitentiary ("WSP") in Walla Walla, Washington, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] Dkt. 3.  Specifically, petitioner is challenging his October 30, 2006 jury convictions in King County Superior Court for attempted murder in the first degree and unlawful possession of a firearm in the first degree.  *Id.* at 1.  Respondent has filed an answer opposing the petition, Dkt. 24, to which petitioner has replied, Dkt. 28.  After careful consideration of the petition, the

---

[1] When this case was initiated, petitioner properly named Superintendent Stephen Sinclair as the respondent in his habeas petition.  As the superintendent of the WSP has since changed, the Court substitutes WSP's new superintendant, Donald Holbrook, as respondent. *See* Fed. R. Civ. P. 25(d).

briefs, all governing authorities and the balance of the record, the Court recommends that petitioner's habeas petition, Dkt. 3, be DENIED and this case be DISMISSED with prejudice.

## II.     FACTS AND PROCEDURAL HISTORY

A.     <u>Petitioner's Commitment Offense and Direct Review</u>

The Washington State Court of Appeals summarized the facts surrounding petitioner's convictions as follows:

> According to testimony at trial, Officer Strauss, a uniformed detective, decided to stop three men around 8 p.m. on January 8, 2006 after he saw them jaywalk across a busy, multi-lane street. The jaywalkers were Randal Johnson, Robert James, and the appellant, Wilford Armstead. They were walking back to Johnson's van with food they had just bought at a restaurant across the street.
>
> Officer Strauss pulled into the parking lot where the van was parked. Johnson walked directly to the van and got into the driver's seat while Officer Strauss approached James and Armstead. James gave his name. Armstead gave Officer Strauss a false name, then turned around and ran to the van.
>
> Officer Strauss could see into the van through the windshield. He noticed that the van was rocking back and forth. Officer Strauss said he heard a lot of verbal commotion inside the van. "I thought I heard [Armstead] saying . . . 'Lets's go, let's go.'" I thought there was a person in the driver's seat that indicated 'I am not getting involved' type attitude."
>
> James also testified to the verbal commotion in the van. He said Armstead was "in an outrage." James heard Armstead order the driver, Johnson, to "Drive off, drive off." Then James heard Johnson say, "No, I am not going to run from the police. I am not going to do it." James testified that Armstead was moving back and forth in the van "like he's looking for something." Meanwhile, James could hear Officer Strauss hollering, "Come out of the van. Get out of the van right now."
>
> Officer Strauss said he saw Armstead reach his right hand inside his jacket. "And that motion to me—and we have probably all seen it on TV a thousand times, but that, in my mind triggered a thought that he could be reaching for a weapon."

REPORT AND RECOMMENDATION
PAGE - 2

James testified that he saw the van door slide open and Armstead jump out. Armstead ran and Officer Strauss chased him. Several witnesses watched Officer Strauss catch up with Armstead and try to grab him. They saw Armstead push Strauss down, then turn and run. Having taken a few strides, Armstead stopped, drew a pistol, turned, and fired a number of shots directly at Officer Strauss. One witness saw Armstead pull back the slide of his gun before he fired in order to load a round into the chamber. Witnesses estimated that Armstead was anywhere from 10 to 35 feet away from Officer Strauss at the time of the shooting. Officer Strauss took a bullet in his neck just above his left collarbone.

After the shooting, Armstead ran off. Officer Strauss hit the emergency button on his police radio. Other officers and paramedics arrived shortly thereafter. Officer Strauss gave the responding officers a description of Armstead that was relayed to all of the other officers in the area.

Several hours after the shooting, Armstead walked into a nearby convenience store. The store clerk testified that she immediately noticed that he was "wet, bloody, cold, and nervous." Armstead asked to use the telephone. The clerk said he called a woman he referred to as "Kiki," and told her, "something went wrong." He told her to bring his money and his "stuff." The clerk called 911. Police arrived quickly and arrested Armstead. Although the gun he used was never located, four cartridge casings from shots fired at Officer Strauss were found at the scene.

Armstead's defense was that he was not the shooter. He testified there was another person present named "D," "Don," "Don Ray," or "Cisco" who must have been the shooter. He also argued in closing that whoever the shooter was, the evidence was enough to support an intentional act but not a premeditated intent to kill. The jury was instructed on attempted second degree murder as a lesser included offense.

The jury convicted Armstead as charged. He received an exceptional sentence of 604 months based on aggravating circumstances.

Dkt. 27, Ex. 16.

REPORT AND RECOMMENDATION
PAGE - 3

1  Petitioner was convicted by a jury in King County Superior Court on October 30, 2006.

2  *Id.*, Ex. 1.  The superior court entered the judgment and sentence on December 8, 2006.  *Id.*

3  Petitioner appealed to the Washington State Court of Appeals.  *Id.*, Ex. 3.  However, the court

4  affirmed the judgment and sentence.  *Id.*, Ex. 2.

5  Petitioner filed a petition for review in the Washington Supreme Court on September 8,

6  2008.  *Id.*, Ex. 7.  The Washington Supreme Court denied review on March 3, 2009.  *Id.*, Ex. 8.

7  On March 16, 2009, petitioner filed a motion to vacate the convictions.  *Id.*, Ex. 9.  However,

8  the Washington Supreme Court denied review of petitioner's motion because the March 3,

9  2009 order denying review by the court "was final and no further motions will be considered

10  by the Court."  *Id.*, Ex. 11.  The Washington State Court of Appeals issued its mandate on

11  March 25, 2009.  *Id.*, Ex. 12.

12          B.       State Collateral Review

13  On March 4, 2010, petitioner filed a personal restraint petition ("PRP") with the

14  Washington State Court of Appeals challenging his convictions.  *Id.*, Ex. 13.  On August 16,

15  2010, the court of appeals denied the PRP.  *Id.*, Ex. 16.  On October 26, 2010, petitioner filed a

16  motion for discretionary review in the Washington Supreme Court.  However, the court issued

17  a ruling denying review on February 22, 2011.  *Id.*, Ex. 18.  The court of appeals issued a

18  certificate of finality on May 6, 2011.  *Id.*, Ex. 19.

19          C.       Federal Collateral Review

20  On March 28, 2011, petitioner filed the instant 28 U.S.C. § 2254 petition for writ of

21  habeas corpus.  Dkt. 3.  Petitioner is currently incarcerated at the WSP in Walla Walla,

22  Washington.  *Id.*

                            III.     ISSUES PRESENTED

23

24  Petitioner's habeas corpus petition presents seven (7) grounds for relief.  *Id.*  The

25  grounds are as follows:

26

REPORT AND RECOMMENDATION
PAGE - 4

1      1.      The State failed to provide any evidence to support its claim of premeditation. The intent to kill is different than premeditation. The alleged shooter in this case was running away from the Officer, [and] this shows anything but premeditation.

2.      Officer Strauss's stop of only the black jaywalkers when there was also a similarly situated person of another race committing the same act and not contacted by police is selective enforcement/racial profiling and any evidence obtained after that fact is unconstitutionally obtained evidence which should never have been heard or seen by the jury.

3.      My court appointed attorney, Marcus Naylor, confirmed that the case involved selective enforcement/racial profiling but refused to use it as a defense despite my constant objections. There have been many other cases where this has been used as a defense to criminal charges such as these.

4.      Judge Richard Jones should have re[c]used himself from this trial because of his association with my brother Warren E. Armstead. Judge Jones even acknowledged my brother during the trial as he had a pending Federal trial . . . that was in the media. My brother has a long standing relationship with Judge Jones's sister Theresa Frank, whom he worked with which may have not been viewed favorably.

5.      Defense counsel Marcus Naylor deprived me of the right to present an alternate theory of the crime by placing me at the crime scene . . . [w]hen my statement to the police was that I had left the scene. Also he never brought out the warrant for an unidentified black male as the shooter, that was issued after I was in custody, in support of my claim of leaving before the crime was committed.

6.      Randal Johnson['s] testimony was allowed to be heard by the jury after [the] judge ruled that if Mr. Johnson had been using drugs the day of the incident, his testimony would not be allowed. On the stand Mr. Johnson testified that he had been using crack cocaine. This testimony was . . . allowed to stand, with no objections from my attorney, even after the trial judge ruled otherwise.

7.      Evan Thompson (forensic lab [s]cientist) testified that the leather jacket that was taken from me at the time of my arrest, tested negative for the presence of lead around the holes in the jacket, but in his opinion the holes were caused by bullets.  This is mere speculation not forensic science, but the jury who are not experts were tainted by this unscientific evidence.

Dkt. 3.

## IV.      DISCUSSION

A.      Petitioner's Grounds 6 and 7 Are Unexhausted and Procedurally Defaulted

### 1.      Exhaustion Standard

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs petitions for habeas corpus filed by prisoners convicted in state courts.  *See* 28 U.S.C. § 2254. In order for a federal district court to review the merits of a § 2254 petition, a petitioner must first exhaust state court remedies.  28 U.S.C. § 2254(b)(1)(A); *Fields v. Waddington*, 401 F.3d 1018, 1020 (9th Cir. 2005).  The purpose of the exhaustion doctrine is to preserve federal-state comity which, in this setting, provides state courts an initial opportunity to correct violations of a prisoner's federal rights.  *Picard v. Connor*, 404 U.S. 270, 275 (1971).  A petitioner can satisfy the exhaustion requirement by either (1) fairly and fully presenting each federal claim to the highest state court from which a decision can be rendered, or (2) demonstrating that no state remedies are available.  *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996).  A petitioner fairly and fully presents a claim if it is submitted "(1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) (internal citations omitted).

A state prisoner must "give the state courts one full opportunity to resolve any constitutional issues by invoking *one complete round* of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (emphasis added).  *See also Casey v. Moore*, 386 F.3d 896, 916 (9th Cir. 2004) ("[T]o exhaust a habeas claim, a petitioner must properly raise it *on every level* of direct review.") (emphasis added).  The Ninth

Circuit also requires that a habeas petitioner explicitly identify the federal basis of his claims either by identifying specific portions of the federal Constitution or statutes, or by citing federal or state case law that analyzes the federal Constitution. *Insyxiengmay*, 403 F.3d at 668. Alluding to broad constitutional principles, without more, does not satisfy the exhaustion requirement. *Id.*

### 2. Petitioner's Grounds 6 and 7 Are Unexhausted

Petitioner raises grounds 6 and 7 as Fourteenth Amendment claims for the first time in the instant habeas petition. Specifically, petitioner argues that the admission of the testimony of Mr. Johnson and Mr. Thompson at his trial violated his right to due process under the Fourteenth Amendment. Dkt. 13 at 13, 15. By contrast, in his state PRP, petitioner argued that his Sixth Amendment right to effective assistance of counsel was violated by his defense counsel's failure to object to Mr. Johnson's or Mr. Thompson's testimony. *See* Dkt. 27, Ex. 13.

As noted above, petitioner must first exhaust his state court remedies by fairly and fully presenting each federal claim to the highest state court from which a decision can be rendered. Because petitioner did not present his Fourteenth Amendment claims to the Washington Supreme Court, grounds 6 and 7 of petitioner's federal habeas petition were not properly exhausted.

### 3. Petitioner's Grounds 6 and 7 Are Procedurally Defaulted

The procedural default doctrine is a separate and distinct defense from the exhaustion requirement that bars federal habeas review. *See Trest v. Cain*, 522 U.S. 87, 89 (1997) ("procedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserve'"). Although different and distinct doctrines, the procedural default doctrine and the exhaustion doctrine intertwine when habeas claims, as here, have not been properly exhausted in state court. A procedural default resulting in technical exhaustion of a claim is considered

REPORT AND RECOMMENDATION
PAGE - 7

1 improper exhaustion. *See Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992) (finding that

2 claims exhausted due to procedural default were "not properly exhausted").

3      A procedural default in state court generally leads to a preclusion of federal habeas

4 review if the last state court rendering a judgment in the case rests its judgment on the

5 procedural default. *See Harris v. Reed*, 489 U.S. 255, 263 (1989). *See also Franklin v.*

6 *Johnson*, 290 F.3d 1223, 1230-31 (9th Cir. 2002). However, if the petitioner has not presented

7 his federal claims to the state courts, the state courts do not need to expressly rely upon

8 procedural default as a predicate to a federal court's determination that federal review is barred

9 due to procedural default. *Harris*, 489 U.S. at 263 n.9. In that case, the "federal courts may

10 properly determine whether the claim has been procedurally defaulted under state law. . . ." *Id.*

11 at 269 (O'Connor, J., concurring).

12      Here, the Court finds that petitioner's grounds 6 and 7 for federal habeas relief are

13 procedurally defaulted. Specifically, petitioner is barred from presenting his claims in a PRP

14 to the Washington courts, because he failed to do so within one year after the Washington State

15 Court of Appeals' mandate on March 25, 2009. *See* R.C.W. § 10.73.090(1) ("No petition or

16 motion for collateral attack on a judgment and sentence in a criminal case may be filed more

17 than one year after the judgment becomes final. . . ."); Dkt. 27, Ex. 12.

18      Before federal review is precluded due to a procedural default, however, the state

19 procedural rule must be an "independent and adequate state ground." *See Hanson v. Mahoney*,

20 433 F.3d 1107, 1113 (9th Cir. 2006). "In order for the procedural default doctrine to apply, a

21 state rule must be clear, consistently applied, and well-established at the time of the petitioner's

22 purported default." *Id.* A procedural default is not "independent" if the state procedural bar

23 depends upon a determination of federal law, and it is not "adequate" if the state courts bypass

24 the procedural rule. *See Harmon*, 959 F.2d at 1461. Where a state court decision denying relief

25 would be based on an independent and adequate state law ground, even a procedural one, a

26 habeas petitioner is procedurally defaulted from bringing his claims to the federal courts. *Casey*

*v. Moore*, 386 F.3d 896, 920 (9th Cir. 2004).  This is because if state prisoners were allowed to meet the federal habeas exhaustion requirement by procedurally defaulting their claims in state courts, "the comity interests that animate the exhaustion rule could easily be thwarted." *O'Sullivan*, 526 U.S. at 854.

In the instant case, petitioner has not made any showing that R.C.W. § 10.73.90 or Washington Rule of Appellate Procedure 13.5(a) are not independent and adequate state law grounds.  Accordingly, federal habeas review of grounds 6 and 7 is precluded because of petitioner's procedural default of these claims in state court.

> 4.    *Petitioner Fails to Show Cause and Prejudice or a Miscarriage of Justice*

If a federal habeas petitioner can show cause for the procedural default in state court and actual prejudice, or a fundamental miscarriage of justice resulting from the alleged federal law violation, federal review of habeas claims is permitted despite the procedural default in state court.  *See Noltie v. Peterson*, 9 F.3d 802, 804-05 (9th Cir. 1993).  To demonstrate cause, a habeas petitioner must show that the procedural default was due to "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  In order to show prejudice, a habeas petitioner bears the burden of showing not merely that an error created a possibility of prejudice, but that the error worked to petitioner's actual and substantial disadvantage, infecting the entire trial with constitutional error.  *Id*. at 494.  To qualify for the "fundamental miscarriage of justice" exception, a habeas petitioner must show that a constitutional violation has "probably resulted" in the conviction when he was "actually innocent" of the offense. *Cook v. Schriro*, 538 F.3d 1000, 1028 (9th Cir. 2008).

Here, petitioner has not demonstrated cause or actual prejudice to excuse his procedural default.  Similarly, he has made no showing that the "fundamental miscarriage of justice"

1    exception applies to his case.  Thus, federal habeas review of petitioner's grounds 6 and 7 is

2    precluded.

3         B.    Standard of Review for Petitioner's Exhausted Claims (Claims 1-5)

4         Under AEDPA, a habeas corpus petition may be granted with respect to any claim

5    adjudicated on the merits in state court only if the state court's decision was *contrary to,* or

6    involved an *unreasonable application* of, clearly established federal law, as determined by the

7    Supreme Court, or if the decision was based on an unreasonable determination of the facts in

8    light of the evidence presented.  28 U.S.C. § 2254(d) (emphasis added).

9         Under the "contrary to" clause, a federal court may grant the writ only if the state court

10   arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or

11   if the state court decides a case differently than the Supreme Court has on a set of materially

12   indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 364-65 (2000).  Under the

13   "unreasonable application" clause, a federal court may grant the writ only if the state court

14   identifies the correct governing legal principle from the Supreme Court's decisions but

15   unreasonably applies that principle to the facts of the prisoner's case.  *Id.*  The Supreme Court

16   has made clear that a state court's decision may be overturned only if the application is

17   "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).

18        Clearly established federal law, for purposes of AEDPA, means "the governing legal

19   principle or principles set forth by the Supreme Court at the time the state court render[ed] its

20   decision."  *Lockyer*, 538 U.S. at 71-72.  "If no Supreme Court precedent creates clearly

21   established federal law relating to the legal issue the habeas petitioner raised in state court, the

22   state court's decision cannot be contrary to or an unreasonable application of clearly

23   established federal law."  *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v.*

24   *Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

25        Finally, if a habeas petitioner challenges the determination of a factual issue by a state

26   court, such determination shall be presumed correct.  The applicant then has the burden of

REPORT AND RECOMMENDATION
PAGE - 10

| 1 | rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § |
| 2 | 2254(e)(1). |
| 3 |     C.    <u>Insufficiency of the Evidence Claim</u> |

1 rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. §

2 2254(e)(1).

3       C.     <u>Insufficiency of the Evidence Claim</u>

4       Petitioner asserts in claim 1 that there was insufficient evidence at trial to support the

5 jury's finding of premeditated attempted first degree murder, thereby violating his due process

6 rights. Specifically, petitioner argues that the state "failed to provide any evidence to support

7 its claim of premeditation." Dkt. 3 at 5. Petitioner states that the person who shot the police

8 officer was "running away from the officer," which demonstrates that there was no evidence of

9 premeditation in this case. *Id.*

10       Respondent argues that there was constitutionally sufficient evidence to prove

11 premeditation in this case. Respondent notes that "viewing the evidence in the light most

12 favorable to the prosecution, the state courts reasonably concluded there was sufficient

13 evidence to support the conviction for attempted first degree murder." Dkt. 24 at 21. Thus,

14 respondent asserts that the "state court determination was not an unreasonable application of

15 clearly established federal law." *Id.* at 22.

16       The Washington State Court of Appeals held that the evidence supported petitioner's

17 conviction. Specifically, the court noted:

18

19           A person commits murder in the first degree if, with a premeditated intent to kill, he causes the death of another person.

20 A person is guilty of an attempted crime if, with intent to commit the completed crime, he takes a substantial step toward committing that completed crime.

21

22           Premeditation is an essential element of attempted first degree murder. Premeditation must involve more than a moment

23 in point of time. Mere opportunity to deliberate is not sufficient to support a finding of premeditation. Rather, premeditation is

24 the deliberate formation of and reflection upon the intent to take a human life and involves the mental process of thinking

25 beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short. Premeditation may be proved by

26

circumstantial evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial.

The test for reviewing a defendant's challenge to the sufficiency of evidence in a criminal case is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . The sufficiency of the evidence to establish the elements of the crime is tested on review of a conviction by drawing all reasonable inferences from the evidence in favor of the State and interpreting them most strongly against the defendant.

That test is met in the present case. Armstead had motive to avoid being apprehended. He knew he faced arrest and significant incarceration when approached by Officer Strauss because he had an outstanding warrant and had a gun and drugs in his possession. Armstead procured a weapon; it is reasonable to infer that he jumped into the van in order to get the gun before he tried to run away. Armstead's course of conduct after obtaining the gun showed further actual deliberation. He pushed Officer Strauss down and began to run, but he then turned around and fired four shots directly at the officer while he was down on the ground. One witness saw Armstead take the time to load a round in the chamber. Each shot required a separate pull of the trigger . . . . When the evidence and all reasonable inferences are viewed in the State's favor, a rational trier of fact could have found premeditation beyond a reasonable doubt.

Dkt. 27, Ex. 2 at 4-7 (quotations and citations omitted).

Under clearly established federal law, "[a] defendant alleging that the evidence was insufficient to support his conviction can obtain relief only if, 'upon the record evidence adduced at the trial[,] *no rational trier of fact* could have found proof of guilt beyond a reasonable doubt.'" *Garcia v. Carey*, 395 F.3d 1099, 1102 (9th Cir. 2005) (quoting *Jackson*, 443 U.S. at 324) (emphasis in original). In this instance, constitutional sufficiency review is sharply limited; great deference is owed to the trier of fact. *Jackson*, 443 U.S. at 319. Under the standard established in *Jackson*,

REPORT AND RECOMMENDATION
PAGE - 12

a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

*Id.* at 326. *See also Jones*, 207 F.3d at 563 ("This is a high standard . . . . It is not enough that we might have reached a different result ourselves or that, as judges, we may have reasonable doubt."). Furthermore, as mentioned above, this Court presumes the correctness of the factual findings made by the state trial and appellate courts unless such findings are rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990). *See also Sophanthavong*, 378 F.3d at 866 (internal quotation omitted) ("To meet this higher standard, [the petitioner] must present sufficient evidence to produce in the ultimate factfinder an abiding conviction that the truth of its factual contentions [is] highly probable.").

Viewing the evidence in the light most favorable to the prosecution, the Court finds that there is sufficient evidence that a rational trier of fact could have found petitioner guilty of premeditation beyond a reasonable doubt. The record demonstrates that the petitioner had a motive to shoot and kill Officer Strauss. Petitioner had an outstanding warrant for his arrest. Dkt. 27, Ex. 27 at 122; *Id.*, Ex. 28 at 31. Officer Strauss testified that petitioner repeatedly told the driver of the van, "Let's go, let's go." *Id.*, Ex. 26 at 112-13. Officer Strauss also testified that he saw petitioner moving around the van and reaching into his jacket as if he were reaching for a gun. *Id.* at 113. A rational trier of fact could have adduced from Officer Strauss's testimony that petitioner went to the van to retrieve the gun, and was attempting to avoid arrest at all costs.

Moreover, petitioner's actions after obtaining the gun demonstrate further actual deliberation. Officer Strauss testified that petitioner knocked him to the ground. *Id.* at 113. Although petitioner initially began to run away, multiple witnesses testified that petitioner turned around, shot at Officer Strauss four times as he was on the ground, and even reloaded his weapon at least once. *Id.*, Ex. 27 at 23-24; *Id.*, Ex. 27 at 114; *Id.*, Ex. 28 at 14-15. For a

REPORT AND RECOMMENDATION
PAGE - 13

1  finding of premeditation, the jury had to find that petitioner had the "deliberate formation of

2  and reflection upon the intent to take a human life . . . [which] involve[d] the mental process of

3  thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time." Dkt.

4  27, Ex. 2 at 4-7. Evidence that petitioner had a motive to shoot Officer Strauss and evidence

5  that petitioner turned around to shoot Officer Strauss after initially starting to run away support

6  the jury's finding that petitioner committed premeditated attempted murder. Viewing the

7  evidence in the light most favorable to the prosecution, evidence presented at trial

8  demonstrates that a rational trier of fact could have found petitioner guilty of premeditation

9  beyond a reasonable doubt. Thus, the state court decision denying petitioner's claim was not

10  contrary to, or an unreasonable application of, clearly established federal law.

11          D.      Discriminatory Law Enforcement Claim

12          Petitioner argues that his Fourteenth Amendment rights were violated when Officer

13  Strauss stopped "only the black jaywalkers when there [were] . . . similarly situated person[s] of

14  another race" who were also jaywalking but were not stopped by the police. Dkt. 3 at 6.

15  Petitioner contends that as a result of this alleged racial profiling, "any evidence obtained after

16  [being stopped] . . . [was] unconstitutionally obtained evidence which should never [have] been

17  heard or seen by the jury." *Id.* at 6-7. Petitioner reasserts in his reply brief that "blat[a]nt racial

18  profiling . . . occurred at the onset of the entire incident." Dkt. 28 at 3.

19          Respondent argues that petitioner's racial profiling claim "is not based on a holding of

20  the Supreme Court." Dkt. 24 at 24. Specifically, respondent notes that the Supreme Court "has

21  'held that we would not look behind an objectively reasonable traffic stop to determine whether

22  racial profiling or a desire to investigate other potential crimes was the real motive.'" *Id.* Thus,

23  respondent argues that petitioner is not entitled to habeas relief based on clearly established

24  federal law. *Id.*

25

26

REPORT AND RECOMMENDATION
PAGE - 14

1    The Washington State Court of Appeals rejected petitioner's claim and noted:

2            . . . evidence of discrimination is weak . . . . More significantly,
3            such a defense could not have succeeded because it was
         unrelated to the elements of the charge of first degree attempted
4            murder.  There is no legal foundation for Armstead's belief that a
         finding of racial profiling or selective enforcement in the initial
5            stop would require dismissal of his conviction.

6    Dkt. 27, Ex. 2 at 7.

7            The Equal Protection Clause of the Fourteenth Amendment provides "that no State

8    shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

9    essentially a direction that all persons similarly situated should be treated alike." *Lee v. City of*

10   *Los Angeles*, 250 F.3d 668, 686 (2001)(citations omitted).  "The Equal Protection Clause

11   provides a basis for challenging legislative classifications that treat one group of persons as

12   inferior or superior to others, and for contending that general rules are being applied in an

13   arbitrary or discriminatory way."  *Jones v. Helms*, 452 U.S. 412, 423-24 (1981).  The Equal

14   Protection Clause "announces a fundamental principle: the State must govern impartially.

15   General rules that apply evenhandedly to all persons within the jurisdiction unquestionably

16   comply with this principle."  *New York City Transit Authority v. Beazer*, 440 U.S. 568, 587

17   (1979).

18           In order to state a claim for violation of due process, petitioner must allege "(1) a

19   deprivation of a constitutionally protected liberty or property interest, and (2) a denial of

20   adequate procedural protections."  *Kildare v. Saenz,* 325 F.3d 1078, 1085 (9th Cir. 2003).  The

21   United States Supreme Court has never held that a person's constitutional rights have been

22   violated if a police officer makes a valid stop, even if the officer had another motive to stop the

23   person.  *See Ashcroft v. al-Kidd*, _ U.S. _, 131 S. Ct. 2074, 2082 (2011).  Indeed, the Court has

24   held that it "would not look behind an objectively reasonable traffic stop to determine whether

25   racial profiling or a desire to investigate other potential crimes was the real motive."  *Id.*

26

REPORT AND RECOMMENDATION
PAGE - 15

1      Here, petitioner cites to the Fourteenth Amendment to argue that his convictions should

2  be overturned because of alleged racial profiling, but he does not state whether his claim is

3  based on equal protection or due process arguments.  Either way, petitioner's argument fails.

4  Petitioner has cited to no state law in which the legislature purposefully created the law in

5  order to target African-Americans or other persons of color who are jaywalking.  Petitioner has

6  failed to show that the state acted with an intent or purpose to discriminate against African-

7  American jaywalkers, as would be required to succeed on an equal protection argument.  In

8  addition, petitioner has not met his burden to demonstrate a violation of due process.

9  Petitioner has not alleged deprivation of a constitutionally protected liberty interest, nor a

10  denial of adequate procedural protections for persons of color who are jaywalking.  Thus,

11  petitioner's Fourteenth Amendment claim lacks merit.

12      Finally, petitioner cites no authority to support his argument that an individual found

13  guilty of an offense can evade the consequences of his criminal activity by claiming he should

14  not have been "caught."  Testimony presented at trial demonstrates that petitioner was illegally

15  jaywalking.  Officer Strauss stated that he saw "three black males crossing the street . . . across

16  the southbound traffic . . . [and] they never paused, they just continued walking across [the]

17  six-lane maybe . . . seven-lane road . . . . [A] white subcompact vehicle actually had to stop to

18  avoid hitting those pedestrians."  Dkt. 27, Ex. 26 at 108.  Petitioner's illegal jaywalking was

19  the underlying reason for his stop, and petitioner has not demonstrated that the officer had any

20  other underlying reason for stopping him.  In light of the Supreme Court's holding that it

21  "would not look behind an objectively reasonable traffic stop to determine whether racial

22  profiling . . .  was the real motive" for the stop, petitioner has not established that the state

23  court decision denying his racial profiling claim was contrary to, or an unreasonable

24  application of, clearly established federal law.

25

26

REPORT AND RECOMMENDATION
PAGE - 16

E.    Ineffective Assistance of Counsel Claims

     *1.    Standard of Review*

Petitioner alleges several instances of ineffective assistance of counsel.  The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland*.  Under *Strickland,* a defendant must prove that (1) counsel's performance was deficient and, (2) the deficient performance prejudiced the defense.  *Id.* at 687.  The reviewing court need not address both components of the inquiry if an insufficient showing is made on one component.  *Id.* at 697.  Furthermore, if both components are to be considered, there is no prescribed order in which to address them.  *Id.*

With respect to the first prong of the *Strickland* test, judicial scrutiny must be highly deferential.  *Id.* at 689.  There is a strong presumption that counsel's performance fell within the wide range of reasonably effective assistance.  *Id.*  A petitioner must show that counsel's performance fell below an objective standard of reasonableness.  *Id.* at 688.  In order to prevail on an ineffective assistance of counsel claim, a petitioner must overcome the presumption that counsel's challenged actions might be considered sound trial strategy.  *Id.*  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance.  In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

1     **2.**  *Petitioner's Exhausted Claims*

2    Two of petitioner's ineffective assistance claims, claims 3 and 5, were exhausted in state

3 court. In claim 3, petitioner argues that although his "[c]ourt appointed attorney . . . confirmed

4 that the case involved selective enforcement/racial profiling . . . [the defense attorney] refused to

5 use [the defense] despite [petitioner's] constant objections." Dkt. 3 at 8. Petitioner argues that

6 "[t]here have been many other cases where this has been used as a defense to criminal charges

7 such as these." *Id.* Furthermore, in claim 5, petitioner argues that his "[d]efense counsel . . .

8 deprived [petitioner] of the right to present an alternate theory of the crime by placing me at the

9 crime scene . . . [w]hen my statement to the police was that I had left the scene." *Id.* at 12. In

10 addition, petitioner notes that defense counsel "never brought out the warrant for an unidentified

11 black male as the shooter, [which] was issued after [petitioner] was in custody." *Id.*

12    Respondent notes that the Washington State Court of Appeals "reasonably rejected

13 [claims 3 and 5] because [petitioner] failed to show both deficient representation and prejudice

14 from counsel's error." Dkt. 24 at 29. With respect to claim 3, respondent argues that the state

15 court "reasonably determined that counsel's decision not to pursue [the racial profiling] defense

16 that would not invalidate the crime was not deficient or prejudicial representation." *Id.*

17 Furthermore, with respect to claim 5, respondent asserts that petitioner "fails to rebut the strong

18 presumption that counsel's decision [to place petitioner at the scene of the crime] was

19 reasonable trial strategy."[2] *Id.* at 30.

20    The Washington State Court of Appeals found that petitioner failed to demonstrate both

21 deficient representation and prejudice from counsel's alleged errors. Dkt. 27, Ex. 2 at 7. With

22 respect to claim 3, the state court noted that "evidence of discrimination is weak," and defense

23 counsel made a tactical decision not to introduce petitioner's theory of the case. *Id.* With

24 

---

25   [2] Respondent also argues that petitioner did not exhaust the second portion of claim 5, in which petitioner argues that his defense counsel should have introduced evidence that a search warrant was still pending for another person after petitioner was arrested. Dkt. 24 at 7.

26 However, the Court finds that petitioner exhausted claim 5, and it is properly before this Court.

respect to claim 5, the court of appeals noted that it "was clearly a reasonable tactical decision" to concede that petitioner was present at the scene of the crime. *Id.*, Ex. 16 at 2. The court noted that "evidence of [petitioner's presence at the scene, including eyewitness accounts, a surveillance video, and DNA, was overwhelming . . . . Under the circumstances, counsel's concession was a legitimate attempt to bolster [petitioner's] credibility." *Id.*

The crux of petitioner's arguments is that defense counsel did not permit petitioner to present alternative theories of the crime. Specifically, petitioner wanted to present a theory of the crime that petitioner was a victim of racial profiling by the police officer, and petitioner did not want his defense attorney to place him at the scene of the crime. Both of petitioner's claims therefore amount to a disagreement with his defense counsel about the best trial strategy. In light of the Supreme Court's holding that "a petitioner must overcome the presumption that counsel's challenged actions might be considered sound trial strategy," petitioner has failed to establish that his Sixth Amendment rights were violated. *See Strickland*, 466 U.S. at 688 (1984).

With respect to claim 3, petitioner's trial counsel reasonably declined to advance petitioner's allegations of racial profiling during the initial stop by Officer Strauss. As noted by the state court, evidence of any racial profiling claims was weak, and "such a defense could not have succeeded because it was unrelated to the elements of the charge of first degree attempted murder." Dkt. 27, Ex. 2 at 7. Although petitioner argues that Officer Strauss committed discrimination in his initial stop by stopping only the African-American jaywalkers and not the Caucasian jaywalker, evidence presented at trial does not support petitioner's theory. Officer Strauss testified only that he "saw three black males crossing" the busy road. *Id.*, Ex. 26 at 108. He did not testify that he saw any other jaywalkers that night. Furthermore, Mr. James, a fellow jaywalker, testified that the Caucasian male, whom petitioner alleged was also jaywalking, was sitting behind the wheel during the entire encounter with Officer Strauss, contradicting petitioner's claim that the officer chose not to stop the Caucasian jaywalker. *Id.*, Ex. 27 at 22.

REPORT AND RECOMMENDATION
PAGE - 19

1    Given the lack of evidence supporting petitioner's theory of racial profiling, defense counsel

2    made a strategic decision not to introduce allegations of racial profiling, and did not violate

3    defendant's Sixth Amendment right to effective assistance of counsel.

4         Similarly, petitioner's counsel made a strategic decision to concede that petitioner was

5    present at the scene of the crime.  As noted by the state court, there was substantial evidence to

6    establish this fact.  Several eyewitnesses placed petitioner at the scene of the crime.  Dkt. 27, Ex.

7    27 at 23; *Id.*, Ex. 28 at 92, 114, 117.  Mr. James, who testified that he has known petitioner for

8    twenty years, also testified that he saw petitioner shoot Officer Strauss.  *Id.*, Ex. 27 at 13, 22-23.

9    Furthermore, petitioner's DNA was found on a drawstring bag found at the scene that had once

10   contained a firearm consistent with a model that was used to shoot the officer.  *Id.*, Dkt. 28 at

11   81, 83-85.  Defense counsel's concession that petitioner was at the scene of the crime did not

12   violate petitioner's Sixth Amendment rights.

13        Accordingly, petitioner cannot establish that claims 3 and 5 amounted to ineffective

14   assistance of counsel.  Thus, the state court decision denying petitioner's ineffective assistance

15   of counsel claims was not contrary to, or an unreasonable application of, clearly established

16   federal law.

17              *3.      Petitioner's Unexhausted Claims*

18        As discussed above, petitioner presented claims 6 and 7 as Fourteenth Amendment

19   claims in his federal habeas petition.  In his state PRP, petitioner presented the same factual

20   claims, but he argued a violation of his Sixth Amendment right to effective assistance of

21   counsel.  Had petitioner presented claims 6 and 7 as Sixth Amendment claims in his federal

22   habeas petitioner, petitioner would have presented exhausted claims for this Court's review.  For

23   the reasons discussed below, however, petitioner's claims still would have failed.

24        With respect to claim 6, petitioner argued in his state PRP that witness Randal Johnson

25   was permitted to testify on the stand even though he had "smoked crack/cocaine the night of

26   the incident."  Dkt. 27, Ex. 13 at 2f-2g.  In his state PRP, petitioner argued that his defense

attorney violated his Sixth Amendment right to counsel by failing to seek suppression of Mr.

Johnson's testimony once he "admitted to using drugs that night." *Id.* at 2g. With respect to

claim 7, petitioner argued in his state PRP that his Sixth Amendment right to effective

assistance of counsel was violated when his counsel failed to challenge forensic expert Evan

Thompson's testimony. *Id.* at 2h-2i. Specifically, petitioner argued that permitting

"speculation testimony . . . without counsel[']s rebut[al] clearly shows ineffective assistance of

counsel." *Id.* at 2i.

The Washington State Court of Appeals rejected petitioner's allegations of ineffective

assistance of counsel, noting that petitioner failed to demonstrate "any deficiency in counsel's

failure to seek suppression of Randal Johnson's testimony." *Id.*, Ex. at 3. In addition, the court

of appeals noted that "defense counsel made a reasonable tactical decision to challenge the

expert's conclusion." *Id.* Thus, the court held that petitioner "failed to make any showing that

counsel's performance was deficient or that he was prejudiced by the alleged deficiencies." *Id.*

With respect to claim 6, petitioner cannot demonstrate ineffective assistance of counsel.

Although petitioner argues that the trial judge stated he would not permit Mr. Johnson's

testimony if he had smoked crack cocaine the night of the incident, nothing in the record

supports petitioner's assertion. Before Mr. Johnson's testimony, defense counsel moved to

admit evidence of Mr. Johnson's history with drug use, which the trial judge permitted in part.

*Id.*, Ex. 30 at 54-57. During cross examination, defense counsel highlighted Mr. Johnson's

diagnosis for paranoid schizophrenia. *Id.*, Ex. 31 at 27-28. Defense counsel also elicited Mr.

Johnson's testimony that he had smoked crack cocaine on the night of the incident. *Id.* at 34. .

Defense counsel's decision to attack Mr. Johnson's credibility, rather than seek exclusion of

his testimony, could be considered sound trial strategy.

Moreover, even if defense counsel's failure to move for suppression of Mr. Johnson's

testimony constituted error, petitioner has failed to demonstrate that the outcome of the trial

was impacted. As noted above, there was substantial evidence of petitioner's guilt. Multiple

1  eyewitnesses placed petitioner at the scene of the crime, including petitioner's friend who

2  testified that he saw petitioner shoot Officer Strauss. Dkt. 27, Ex. 27 at 13, 22-23; *Id.*, Ex. 28

3  at 92, 114, 117. Furthermore, DNA evidence placed petitioner at the scene of the crime. *Id.*,

4  Dkt. 28 at 81, 83-85. Thus, even if defense counsel committed error by not moving for

5  suppression of Mr. Johnson's testimony, petitioner cannot establish that the deficient

6  performance prejudiced his defense. As such, petitioner has failed to establish that he was

7  denied effective assistance of counsel in violation of his Sixth Amendment right.

8      Petitioner's seventh and final ineffective assistance of counsel claim challenging the

9  forensic expert's testimony also fails. As noted by the supreme court, "[c]ounsel's cross-

10  examination of the witness, eliciting a concession that the holes could have been caused by

11  something other than bullets, suggest that counsel made a sound tactical decision to not

12  challenge the testimony so that alternative theories for the holes could be explored." *Id.* On

13  cross-examination, defense counsel challenged many aspects of the forensic expert's

14  testimony. Defense counsel asked the expert why he used a different gun to compare the bullet

15  holes on the jacket, rather than using the officer's gun. *Id.* at 52. Defense counsel asked why

16  the defendant's hands or the sweatshirt he was wearing the night of the incident were not tested

17  for gun residue. *Id.* at 68. In addition, defense counsel questioned the expert extensively about

18  the bullet holes in the leather jacket that the defendant was allegedly wearing the night of the

19  incident. *Id.* at 71-77. Defense counsel's extensive questioning of the expert challenged the

20  credibility of the testimony, and created doubt about whether or not the jury could rely upon

21  the expert's testimony. These questions indicate that defense counsel made a tactical decision

22  to challenge the testimony rather than move for exclusion of the testimony. As noted

23  previously, reviewing courts will not find ineffective assistance of counsel for what may be

24  considered sound trial strategy.

25      Accordingly, even if petitioner's claims 6 and 7 had been brought under the Sixth

26  Amendment rather than the Fourteenth Amendment, petitioner has failed to establish that claims

REPORT AND RECOMMENDATION
PAGE - 22

1   6 and 7 amount to ineffective assistance of counsel.  The state court decisions denying his

2   ineffective assistance of counsel claims were not contrary to, or an unreasonable application of,

3   clearly established federal law.

4           F.     <u>Trial Judge Bias Claim</u>

5        Petitioner asserts in claim 4 that the trial judge was biased because of the judge's

6   "association with [petitioner's] brother."  Dkt. 3 at 9.  Petitioner argues that his "brother has a

7   long standing relationship with [the trial judge's] sister . . . whom [his brother] worked with."

8   *Id.*  Petitioner argues that the trial judge "should have recuse[d] himself or refused [t]o

9   participate in deciding [petitioner's] case . . . [because] the judge ha[d] a special interest in the

10   outcome of [petitioner's] case . . . [which] influenced his decision."  *Id.* at 20.

11        Respondent argues that petitioner's "claim of judicial bias fails [to] present the type of

12   extreme case the Supreme Court has previously found rose to the level warranting recusal."

13   Dkt. 24 at 33.  Respondent further notes that "there is no allegation that the judge had a personal

14   interest in [petitioner's] case."  *Id.* at 34.  Moreover, respondent asserts that petitioner "presents

15   no proof that the judge disliked or harbored a grudge against [petitioner's] brother or

16   [petitioner,] . . . [and] the record fails to present any proof of bias."  *Id.*

17         The court of appeals found that petitioner and his counsel "made a strategic decision not

18   to raise the issue [of the judge's alleged bias] at trial."  Dkt. 27, Ex. 16 at 4.  In addition, the

19   court noted that "[d]ue process, the appearance of fairness, and Cannon 3(D)(1) of the Code of

20   Judicial Conduct require disqualification of a judge who is biased or whose impartiality may be

21   reasonably questioned."  *Id.*  However, the court also noted that "[t]he trial court is presumed

22   . . . to perform its functions regularly and properly without bias or prejudice . . . [and] the party

23   seeking recusal must support the claim with evidence of the judge's actual or potential bias."  *Id.*

24   Noting that petitioner's claims were conclusory, the court of appeals found that he had not met

25   his burden to demonstrate trial judge bias.  *Id.*

26

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge. *See In re Murchison*, 349 U.S. 133, 136 (1955). In some cases, the proceedings and surrounding circumstances may demonstrate actual bias on the part of the judge. *See Taylor v. Hayes*, 418 U.S. 488, 501-04 (1974). In other cases, the judge's pecuniary or personal interest in the outcome of the proceedings may create an appearance of partiality that violates due process. *See Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995). "Of course, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a minimum standard." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). "Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar. But the floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Id.* at 904-905 (citing *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (internal citations omitted)).

Petitioner fails to establish trial judge bias in this case. Petitioner merely alleges that the trial judge's sister had a previous business relationship with petitioner's brother. However, petitioner fails to provide any evidence that the business relationship between petitioner's brother and the trial judge's sister meant that the trial judge had any actual bias or interest in the outcome of petitioner's case. Petitioner has not presented any evidence that the trial judge harbored any ill feelings against petitioner's brother or petitioner. Thus, petitioner cannot demonstrate that he was denied a fair trial in a fair tribunal by an impartial judge.

In addition, as noted by the court of appeals, petitioner and his counsel "made a strategic decision not to raise the issue [of the judge's alleged bias] at trial." Dkt. 27, Ex. 16 at 4. In his state PRP, petitioner admitted that he brought his concerns about the trial judge to his counsel. *Id.*, Ex. 13 at 2k. However, as noted by the Washington Supreme Court, petitioner "admitted in his personal restraint petition that he broached the subject [of trial judge bias]

with defense counsel, and that it was decided not to challenge the judge in the apparent hope that a benefit would derive from the fact that both [petitioner] and the judge were African-American." *Id.*, Dkt. 17 at 2. As petitioner previously determined that there was no actual bias on the part of the judge, he cannot now argue that he was denied due process based on alleged trial judge bias. Accordingly, petitioner fails to demonstrate that the state court decision denying his trial judge bias claim was contrary to, or an unreasonable application of, clearly established federal law.

G.    Certificate of Appealability

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to any of the seven grounds asserted in his habeas petition.

V.    CONCLUSION

For the foregoing reasons, this Court recommends that the petition be DENIED and this case DISMISSED with prejudice. A proposed Order accompanies this Report and Recommendation.

DATED this 5th day of December, 2011.

*James P. Donohue*
_____
JAMES P. DONOHUE
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 25